Our next case this morning, Your Honor, is 25-1519, Gina Russo v. New Hampshire Neurospine Institute. Appellant's counsel, please. May it please the Court, my name is Robert Mantel, arguing on behalf of the appellant, Gina Russo. Kami Verdrager is with me. If I may, could I have three minutes of rebuttal? You may. Thank you. Despite 11 years of accolades, bonuses, and positive evaluations, Gina Russo was terminated by the New Hampshire Neurospine Institute because of her gender, and her transition period and contractor position were ended due to retaliation. The Supreme Court tells us that the Institute is liable for discrimination if Russo's supervisor, in this case Dr. Ahn, quote, performs an act motivated by unlawful animus that is intended by the supervisor to cause an adverse employment action, and if the act is proximate cause of the action. In this case, Dr. Ahn was the proximate cause for Russo's termination. The Institute's board rubber-stamped it. The Institute fired Russo despite the fact that they never found she did anything wrong, never disciplined her, never evaluated her as inadequate. When terminating Russo, what tells us, I mean, the key is what tells us that Ahn was improperly motivated. I mean, that's what this comes down to. We know there's ample evidence of that. Dr. Ahn's behavior was suffused with gender dynamics. His sense that Russo avoided work for him was supported by assertions that she was insufficiently warm to him and did not communicate well with him through body language and eye contact. His responses to Russo were unprofessional and over the top. For example, arguing that she did not help him in 2016, even though he knew that two doctors had told her to stay with a different patient, and in 2019 when he was arguing for her termination, he relied... It could be that she did nothing wrong in staying at Elliott, but she was rude about it. And so if she was rude about it, that would be a reason that he might be upset about it, whether she did something wrong in the sense of she should have acted, gone somewhere different. So what tells us it's gender motivated as opposed to Dr. Ahn may have a thin skin. That's maybe not good, but it's not gender discrimination. There's two answers to that. First, his reasoning for the termination was the merits. She did not help me. So in arguing for termination, he says she did not come and help me in 2016. And two other doctors at that termination meeting have to say she did everything right. It's pretty clear in the conversations with Wang that he says she was rude to me. Sorry? When when he calls Wang to try to think it's whichever doctor it was to check on whether she really was doing something at Elliott that was important, part of what he says is she was rude and disrespectful. That's right. And when you're in a stereotyping case, it can be that Ahn genuinely felt frustrated with Rousseau, but we have an enormous amount of data here showing that his perception of rudeness was gender related. For example, he had many, many interactions with women in the workplace. He would refuse to speak to one physician's assistant for months. He had an extended conflict with another woman based on her failure to say hi and blocked her promotion after it was announced. He would yell at his subordinates asking how dare they do something and accusing them of disobeying with him. He would hang up on them. Other female colleagues reported being screamed at, belittled in front of students, thrown out of the room, refused to work with him. Even Talbot. Did he also refuse to work with some other male employees as well? No, the answers to interrogatories do not say that. And so there is a dispute of fact to that. The answers to interrogatories clearly say he refused to work with the only women physician assistants, but those same answers to interrogatories do not say that he refused to work with men. So that is in dispute. Now, even Talbot Kleeman, the female executive director, reported episodes of yelling and coldness between her and Ahn. How is that disputed? I mean, Ahn says, I refuse to work with Smith and Denzik, two males, and I want them to be terminated. How are you disputing that that's not true? Because in the answer to interrogatory 15, we ask specifically, who did you refuse to work with? And he does not include those gentlemen. Therefore, and he does include Plamadon and the plaintiff. So there is a dispute of fact. Because of his own inconsistencies? Correct. Now, in fact, we have evidence that he yelled at Talbot Kleeman's sister and about failing to type something correctly and for years they couldn't interact. Now compare that to how he treated men in the workplace. Same people, physicians, assistants. And Tim Miller says that he never saw, he saw blow-ups, but he never saw a blow-up against another man. The data was there were men who mocked Ahn, there were men who made mistakes, that he dealt with them respectfully, that he used these moments as teaching moments. There is a dramatic difference between how he treated men versus women. The women we have actual examples, actual data. You know, they're saying, oh, well, he was a high strung, but we do not have similar examples of that at all. The males, including Tim Miller, specify that there were no similar examples against a man. Now, we also have evidence of discrimination based on the combination of the prima facie case and pretext, and we have a lot of pretext. We have, for example, the Institute's brief says in three places, she called him lazy, she was unapologetic. Well, that conversation occurred the day after the termination, so we know that's pretext. And we have that uncertainty because Talbot Kleeman writes a memo dated March 26, saying, on this day, I had a conversation with Russo, and she said these things, the lazy things. So we know that the comments they're claiming they relied on occurred after the decision to terminate. Wasn't there a testimony to the extent that kind of the straw that broke the camel's back was the rudeness at the third identified event? Again, his reasoning was based on the merits and not the rudeness, and let me explain. This is Ahn's thing, saying, when I asked Russo to do this, she said, I'm at CMC, so do you want me to go home and do this, or do you want me to walk you through so you can do it yourself? I was taken aback because I obviously would not want her to stop her current tasks in another hospital and have her walk me through multiple computer tasks, which would have been extremely inefficient. She was framing a choice for me to make so that she could get out of doing the task. He's not talking about rudeness here. He's talking about the choice that she's giving him, which is, I'm happy to go home and do it, or I'm happy to talk you through it. Now he's saying this choice she gave him was an effort to get out of doing the task when she is saying, here's how I can do the task. So he is reacting. None of this, I mean, all of this is in the eye of the beholder. I mean, I take your point on men and women, and we'll have to dig into the record and figure out if he's treating people differently. But to say he's difficult, he's short-tempered, just by itself doesn't really advance the ball. I mean, you say it in a way that sounds pleasant. We don't know that's how she said it. I mean, so it has to be something that ties it to gender, not just he's difficult. Well, the comparator evidence is overwhelming. For example, he refused to work with women but did not refuse to work with men. He has this statement, I couldn't look at myself in the mirror as a husband and father, and let me break that down for a minute. Husband and father has a legal and biological element. He wasn't referring to those. He was referring to the idea that as a husband and father, you get to have a leadership bearing, you're entitled to deference. And what he's saying is the way she treated him was inconsistent with how he expected himself to be treated as a husband and father, and in turn, imposed those traditional gender roles into work. You just added the gender roles, because I could say the exact same comment if the person on the other side of that was a male. I don't see how the father and husband connect to who's doing the disrespectfulness. The husband and father are masculine roles. It says men. They're just his roles. He is a husband and father. Yes. But why does that tell us who's on the other side acting in a way that he finds disrespectful? It could have been a man. He could make the exact same comment. It could have been, but a reasonable jury could find. Why? Why is that anything but pure speculation? Because we have this overwhelming comparator evidence we have. Right. So that's the evidence. I agree with you. We have to dig into that and figure out if that's right or not. But this doesn't really advance to that point. The comparator evidence needs to be resolved. But I don't see how that comment, which is a centerpiece of your brief, has gender connotation on its own. You know, I talk to people about that comment, and they acknowledge that there is a gender component to it. But let me back up with... Can I just turn you to a separate issue? Because I'd like to talk about, before we're done, the retaliation claim. And I'd like to better understand your position on the adverse action, given the ongoing negotiations over what kind of the tail end of her transition period would look like, and potentially her attorney cutting off the negotiations there. So what's the adverse action? The adverse action is, one, they contemplated her working through June 2019, and for continuing to work in a contractor status. But they contemplated that, right? Yes, they contemplated that. And then they curtailed it after her lawyer said she's been discriminated against. But also after her lawyer rejected the offer, right? But they were contemplating continuing through June. I'm curious about the ramifications of a holding that you're asking us to reach there. Are you suggesting that once negotiations are underway, the employer's hands are tied and they have to agree to whatever they initially offered in order to avoid a retaliation claim? And that seems to me to really create problems for these kind of negotiations that might occur. It's not just a negotiation. They didn't suggest this out of sympathy. They wanted someone to cover the next three months. They needed her. So that's why they... Turned them down, right? No, she didn't turn them down. The demand letter contained an expectation that she would continue working there to the end. And so under the Alvarez case, which I provided you, I think it's dispositive. They cannot curtail a transition period based on a protected conduct. And that's what happened. The day after the protected conduct, Talbot-Clement says, she's done. We have to get her out. She's making allegations we don't support. Unless there's anything else? On the retaliation point, they tell her, March whatever the meeting was, you are terminated. But there's no day after that that she doesn't work. I mean, it's understood right away with Talbot-Clement she will continue to come to work? Yes. She never says I'm not going to go to work now. She goes on vacation April 19th to the 24th or something. But there's always an expectation from her point of view that she's going to continue working. And then they never told her to stop until that day. Which is the day that the letter comes from the lawyer that says, I want this large severance. There's gender discrimination. And I'm not happy with the independent contractor agreement that you've provided. And then, I mean, I do think there's sufficient evidence of retaliation, which is why it comes down to, is it an adverse action? And so if you would describe the adverse action very precisely, you would say it is truncating the transition period so that she loses two months of salary and taking away the independent contractor position that she had been working in for years, by the way. Can you point me to the agreement that would support her expectation of another two months? Well, no one disputes that the idea that was propounded on March 26th was continue for the next three months. Everyone was on board with that. That was never taken away. That was pending an offer. I'm struggling with this because that was pending an offer from the employer that they deemed acceptable. And so they apparently tolerated her continuing to come back to work during that period of time. But then once that offer was rejected, I'm struggling to see how she could impose her expectation of continuing to work, having rejected the offer from the employer. Right. Well, I'm suggesting to you that it was not only a part of the negotiations. It was an aspect of their need to continue to have someone in that position for that period of time. They started recruiting the day after her termination. They needed her. They didn't say this is contingent on a successful resolution. How does this case come out if they say, well, it seems like we're not going to be able to find a way for you to continue working here because you're not accepting what we want. So we think it's best we separate today. That's a different case because we have direct evidence that it wasn't that. It was she's making these allegations. She's done. The next day. So it's purely retaliatory. With knowing that sort of our negotiations will stop over how long I can stay with the question of this case is would that reasonably dissuade a person from complaining about gender discrimination? Exactly. Thank you. Attorney Betancourt, please. May it please the court. My name is David Betancourt and I represent Dr. Urion. The district court correctly found that Gina Russo had failed to establish the elements of a prima facie case of gender discrimination. Now, the only issue on appeal relating to Dr. Onn is his potential liability under the New Hampshire law against discrimination and sort of the Fred Fuller versus EOC case, which requires establishment of a discriminatory prima facie case, do you think was not satisfied? So it depends on what elements the court decides to use to create a prima facie case. As the courts explained, when you're setting up the elements for a prima facie case for gender discrimination, it's somewhat fact specific. The district court used the Serrano-Colin framework. I think in their reply brief, Russo suggested using Ripley instead. Either way, under the Serrano-Colin, one of the issues is whether or not Gina Russo was performing her job adequately. Under the Ripley, one of the questions for analysis is whether the facts surrounding the termination. Isn't that a minimum of a disputed fact? In this case, some people thought she was. Onn didn't. But I mean, whether she was or wasn't, they have met, I would think, their minimal burden of showing some evidence on that point. So I don't know that that's your strongest place to start. So the district court's holding is their burden under the McDonnell-Douglas framework to establish a prima facie case. They didn't. Then the district court assumed they would be able to establish it and then analyzed the case to decide, is there any evidence to rebut this non-discriminatory motive for the discrimination? And the factual record does not support that this termination was related in any way to gender. It relates to this deterioration of the working relationship between Gina Russo and Dr. Onn that occurred over a number of years. I'm most interested in the comparator evidence argument. What's your response to what you heard your opposing counsel state as far as treatment of other men and, for instance, accepting them or not accepting them in the operating room? So I think it's an incorrect statement of the record. I think it's undisputed if you look at the interrogatory answers of New Hampshire Neurospine, where they state that review of their records indicates Dr. Onn recommended termination for both Russell Dennis and Michael Smith, who were male PAs. That corroborates the testimony that Dr. Onn offered at his deposition, that he didn't want to operate with those two male PAs, and that those were the only other two individuals besides Gina Russo that he wanted to advocate for termination for in the course of his 20 years at New Hampshire Neurospine, as he started in the year 2000. In addition, you also have deposition testimony from Ann Talbot-Clemen, who is the executive director of New Hampshire Neurospine, also corroborating that Dr. Onn had these issues with Michael Smith and Russell Dennis. So I think to the extent that the plaintiff is trying to use this omission in the interrogatory to create a genuine issue of material fact, that's really not supported by the evidentiary record, which was undisputed below that Dr. Onn had these issues with these male PAs in addition to Gina Russo. The difference is with those male PAs is they resigned prior to proceeding to any type of termination, so there wasn't the same adverse action. But in terms of the comparator evidence, the plaintiff simply is incorrect that he treats male PAs differently from female PAs. Rather, the evidence shows Dr. Onn has certainly very high standards. I think, as Investigator Bailey noted, it's not just, I mean, I understand the focus on termination, but there seems to be some evidence that when there was somebody who sort of acted up or out, he acted differently if they were male towards female, which is different than termination. Certainly, and, you know, we certainly disagree that the record actually supports that or creates any issue of material fact. You know what, if you see in the... They focus on Miller, so... I'm sorry? They focus on Mr. Miller saying, you know, when I did things or that he acted as a, it was a teaching moment and didn't, you know, blow up, and he doesn't blow up at men. Yeah, and I think it also ignores the fact that he his testimony is that one of his favorite PAs to work with was Karen Berry, who he indicated, described as one of the most highly skilled PAs that he worked with in his time at New Hampshire Neuroscience. Those aren't mutually inconsistent. You can be pleased with how a woman who you happen to like acts, but in general, you blow up at women who don't do what you want, but men who don't do what you want, you're more forgiving. I don't see how that... And I think it's a summary judgment, at least. Yeah, sure. Well, I don't think the record supports this finding that he actually blew up at women when they didn't do what he wanted. You know, there are certainly, you know, there's hearsay evidence in emails of different people complaining about him, other than Mr. Miller indicating that there was this teaching moment. The evidence of the record simply isn't there, that he has this tendency to blow up every time someone takes a contrary tone with them. In fact, you know, when you even look at the initial March 2016 incident, when he had this substantial disagreement with the plaintiff about whether she was going to go to the hospital to attend to his patient, there's no indication he blew up, or he simply tells her, all right, get to St. Joseph's Hospital when you have the chance. At the end, even though he was feeling incredibly disrespected at that point in the conversation, even though his wife was listening to the conversation, testified that she couldn't believe the tone and the attitude that Gina Russo was exhibiting in the context of that oral communication. So, you know, I don't see that there is actually sufficient evidence on the record to support this sort of speculation and character assassination by the plaintiff that he has this tendency to blow up at female PAs. Investigator Bailey's... So Miller said, did he not, that he did blow up on occasion, that Ahn did blow up on occasion, but when it was male PAs, he tended to later come and talk to them in a more calm fashion to smooth things over, I believe his words were. Is that not a distinction between his treatment of women PAs and male PAs? I disagree that sort of Mr. Miller's sort of anecdotal opinion evidence is empirical evidence of how he treats female PAs over the course of his tenure, sufficient to create an issue of material fact, especially simply because, you know, you have the opinion of one male PA doesn't establish that there is gender bias at root here in the issue, as opposed to... Not evidence that when he blew up at male PAs, he then tried to smooth things over with them when the guy says that's exactly what he did? So I don't believe the evidence supports that he was advocating for termination of male PAs such as Michael Smith and Russell Dennis, who he didn't believe there was any opportunity to smooth things over. He would attempt to smooth things over if he believed there was a chance the issues could be fixed and resolved, which has to do with his assessment of, you know, how they worked with him in the operating room. There's no indication that has to do with gender, as opposed to sort of gender neutral. Miller said it was gender. Miller's opinion that this occurred, Miller obviously... Sticking to fact, when it was male PAs, he would smooth things over later. It's not opinion. Well, I think characterizing it as smoothing things over, as opposed to having further conversations in terms of what are you doing wrong? How can your performance be improved? I think that is somewhat of a... How else is this ever proven? I mean, it has to be proven some way where we're showing disparate ways of treating people. Well, we don't keep records of that. Other people observe how someone acts, and they say, I noticed that he treats the men this way and the women that way, and that's got to be evidence of how you treat people. I mean, there's no other way to do it. Well, I think you look at sort of the empirical evidence in terms of his relations over the totality. I think you can take individual statements regarding an opinion as to how an individual acted, but then you also have to look at what are the reasons for that specific interaction, like with this one male PA? What happened which caused him to decide this is an issue that he could approach later? And I think that's part of the problem in this case for the plaintiff, is that they didn't establish enough factual evidence at the summary judgment stage to establish that the reason he's talking to these PAs has to do with gender-motivated animus, as opposed to other gender-neutral reasons. If there are no further questions. Attorney Quinlan, please. Good morning, Your Honors, and may it please the Court. My name is Amanda Quinlan, and I'm here on behalf of the Appellee New Hampshire Neurospine Institute. This Court should affirm the lower court's judgment, granting summary judgment for two reasons. First, plaintiff's claim for retaliation fails for lack of causation and the fact that terminating voluntary negotiations is not an adverse employment action. Second, where the practice's non-discriminatory reason for terminating plaintiff never wavered, and where there's no discriminatory animus by Dr. Ahn for Katzpah liability to attach. You agree if Ahn, who was a partner in this place, was motivated by gender and came in and said, it's her or me, and he's motivated by gender, and then the company, the practice said, well, it's going to be you because you're the doctor, that that would be sufficient for liability? No, Your Honor, because under Katzpah liability, and as plaintiff's counsel expressed, this isn't a rubber stamping of what Dr. Ahn wanted to happen. It's undisputed in the record that each of the surgical partners at that meeting had an opportunity to grapple with this issue, decide whether there were alternative solutions to the decision that they were faced with. They would have been given an ultimatum based, I mean, I'm assuming, based on gender bias of their partner, and they're given this ultimatum. So how does that, what absolves the durospine for acting on the ultimatum that's motivated by their partner's gender bias? Well, the evidence shows, Your Honor, that they really grappled with this issue of what to do, whether to part ways with the 20-year surgical partner at their practice or to say goodbye to plaintiff, and it's undisputed that the reason given by Dr. Ahn here is that he felt so disrespected that he could not continue his employment at the Institute. He would either leave or plaintiff would have to go, and what plaintiff fails to do, as Your Honor pointed out, is tie that feeling of anything related to gender. The best that she comes up with... The Virgin, what if they did? What if they've done that? If they did... The Virgin is there saying, based on gender animus, get rid of her, and if you don't, I'm leaving. So put aside the disrespect. I'm not saying that's wrong, I'm just saying put it aside. Assume he's motivated by gender animus. It's a tough choice for the rest of the partners, but ultimately they decide we're going to get rid of her because we'd like to keep on. It would be a closer call, Your Honor, but I think there's still a question here whether it's a rubber-stamped issue, and I don't think it is, given that all of the partners at the practice went and had the opportunity to say their piece on the issue. It's not that the practice has to prove the plaintiff did anything wrong. Instead, what the plaintiff has to prove is that that disrespect, which is undisputed in the record, he reports it to the executive director, to his partners, to the investigator, and it's corroborated, in fact, by plaintiff's own statements about Dr. Ahn, which don't take place after the shareholder meeting. They occurred beforehand, and we see that on pages 380 through 81 of the record. She says that she doesn't respect Ahn. She calls him names. That is corroboration for that feeling of disrespect that Dr. Ahn felt, and we know from the Santiago case that we can decide an issue of motive and intent on summary judgment where all the plaintiff relies on or the non-moving party relies on is conclusory allegations, unsupported speculation, and improbable inferences, and that's all we have here with this statement about looking in the mirror as a father to small children. As far as a retaliation claim goes, the only adverse employment action that occurred here was on March 25, 2019, when the plaintiff's employment was terminated. It was not until four days later. Is there some sort of implicit agreement that she could continue working at the institute for a period of time such that, you know, once they hear of the was there some sort of agreement between the parties that she could continue working during that period of time? The only agreement that was in place was an agreement to try to come to a resolution, and she was working in part fired or not fired. The decision to terminate is made. Correct. She continues to work. Correct. No one tells her don't work. That's correct, Your Honor, but it is incorrect. And they're working out some kind of longer-term situation, and they come to some kind of disagreement about that in a letter that discusses her gender concerns, and the response is, we're done. We don't like the allegations you're making. So it seems to me that there was some kind of loose relationship continuing on that was somewhat undefined, but the letter ended it, and the evidence is, at least to me, enough for a jury to think the reason the letter ended it was the retaliatory response of Talbot-Clement. A couple of corrections in that chronology, Your Honor. First of all, the first time the plaintiff raised gender discrimination allegations was March 29th. In that conversation with the executive director, she raised these allegations. Why is that operative? So, I mean, all right, so Clement just thinks, well, she's carrying on with it. This is really getting annoying. We're done. Well, that's well before the letter came, Your Honor. No, but so what? So she said it once, and they didn't do or they did do something, and then she says it again, and now Clement reacts. You know, getting a lawyer a letter that says it is, you know, more jarring, and she reacts that way. I mean, I just don't see why you're sort of insulated because she didn't do something on the March 29th statement about gender. Well, we know from the David case, Your Honor, that where an employee rejects an offer made by an employer, that's not adverse action against that employee. That's action taken by the employee herself, and that's exactly what happened here in that letter on April 29th. She rejected the independent contractor agreement that was part of the proposal that New Hampshire Neurospine had set forth, didn't propose any alternative red lines to it. She rejected all of the terms up until that point had been negotiated, what the last day of work would be, how the PTO would play in. In a correction, it was not agreed to that she would stay until June. The last proposal that was on the table was that she would work until April, and they never heard back from plaintiff's counsel until that rejection occurred. Here's the problem that I have with your narrative. It's determined that she has been terminated or will be terminated, with the date to be figured out later, hopefully through negotiation. Subsequent to that, she's an employee at Sufferance. Judge Afrin pointed out she shows up for work. I'm going to assume she got paid, but whether she did or not, she's not told that she can't work. When she then is fired, she's not told that she can't work. There are two reasons that are given that I saw in the record. One is the demands that she makes. The other are the unacceptable allegations. So you've got this sort of this mixed thing. One may be sufficient, but how do you deal with the fact that the statement is made that she's made unacceptable allegations? That is classic retaliation. And it has to be tied though to an adverse employment action, and the adverse employment action stated was they terminated her employment at Sufferance. And you cannot terminate an employment at Sufferance for on illegal grounds. You can't do that. May I answer, Your Honor? Of course. She was not entitled to that extended period. That was still under negotiation. What the last... But it was happening. She was showing up. They weren't telling her not to show up. She's showing up day after day or taking vacation, which is, you know, her earned time. She is showing up. And then they say, stop showing up because we don't like your allegations. But that's all because part of the offer that the practice had made was you can continue working until X date. You can have this PTO to extend that term of employment. You can have the severance pay. All of that went away when it was rejected by the offer. All those terms that had been negotiated up until that point were rejected when instead... They had said, and so we are... Your employment at Sufferance ends now because you've rejected our reasonable attempts to settle this. But that's not all they said. They said because she made unacceptable allegations. That's the problem that I'm still waiting to hear an answer on. And she wasn't entitled to that extended employment. This isn't the Alvarez case. Well, employees entitled to anything. They show up to work and then they can be fired at any moment, except if it's for an illegal reason. So she's still showing up to work as an at-will employee. And so would you be reasonably dissuaded from complaining if you thought that this at-will employment that I have right now will be terminated? I mean, that would be the question. But she wasn't dissuaded, Your Honor, because she rejected the agreement. She instead wanted that payment. She didn't want to continue working. That was part of the proposal that had been made. And for all these reasons, Your Honor, we respectfully ask that you affirm the lower court's decision granting summary judgment. Thank you. Thank you. You asked earlier about what connects the situation to gender discrimination. The very clear prima facie case plus pretext creates that link. And that's what we have here. Of course, we have prima facie case. She was replaced, but a part-time woman was replaced by a full-time male, Eric Velasquez, soon after her termination. But spend your time on the pretext, not the prima facie case. Right, right. Well, many examples of pretext in the brief. One, he says that she can't operate with me because her skills are inadequate. The evidence is overwhelming that she was very skilled. Is it really unclear that when they go to the board, the partners, to get rid of her, it's because he finds her to be rude, disrespectful, and somebody he can't work with, and it's her or me? I mean, isn't that the reason? No. No, because in a stereotypical case, what is the presentation made to the board? You look to the reasons for the ultimatum in a cat's paw case. You don't narrow the inquiry as to was there an ultimatum or not. It's what was the reasons for the ultimatum, and many of the reasons for the ultimatum are shown to be pretextual, because that's the proximate cause, right? They did not, the board doesn't investigate. They don't bring her in. They're not trying to determine if she was insubordinate at all. They never made that finding. All they said was, we have an owner. We have a shareholder. We have a voting board member. We have a doctor. We have to stick with him. That's the only thing that they said. So then you have to look at the motives for the ultimatum, and those disappear under examination. Another example is he claims that she gave surgical advice to a patient. She never did, and he acknowledges, I don't know what he said to her, but then in this fit of anger, he says, you're only supposed to advise patients about bleeding and infection, and she says, what are you talking about? I have to do all risks, and later he says, she's right, but he was so angry that he told her the wrong thing. I mean, this is a man who's over the top. This is a Burns versus Johnson issue. So they talked about how he liked working with Barry. Well, Barry doesn't come forward and say he was respectful to her at all. This is a situation where all the doctors, all the 11 doctors over all these period and significant turnover were male, and also all the women leave the physician's assistant position, and in fact Jenkins during the termination says, hey, this looks like gender discrimination. I'm concerned about this. That's what he says, and a reasonable jury could say the same thing. Thank you. Thank you.